## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| ISAI PONCE MUNOZ, | |
| Petitioner, | CIVIL ACTION NO.: 4:22-cv-9 |
| v. | |
| BLANCA ESTELA BUENROSTRO DIAZ, | |
| Respondent. | |

## O R D E R

This action was initiated by Petitioner Isai Ponce Munoz's (hereinafter "the Father") filing of a Verified Petition for Return of Child[ren] to Mexico (hereinafter "the Petition") against Respondent Blanca Estela Buenrostro Diaz (hereinafter "the Mother"). (Doc. 1.) Following a hearing conducted on March 28 and 29, 2022, and for the reasons set forth below, the Court **GRANTS** the Father's Petition.

## BACKGROUND

### I.   The Hague Convention and the International Child Abduction Remedies Act

The Hague Conference on Private International Law adopted the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention) Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11, in 1980 "[t]o address the problem of international child abductions during domestic disputes." Lozano v. Montoya Alvarez, 572 U.S. 1, 4 (2014) (internal quotation marks omitted).

In 1988, the United States ratified the Convention and passed the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, as amended, 22 U.S.C. § 9001 et seq., the

implementing legislation in the United States. <u>See</u> 22 U.S.C. §§ 9001, et seq. The treaty was

ratified between the United States and Mexico on October 1, 1991. <u>See</u> U.S. Hague Convention

Treaty   Partners,   https://travel.state.gov/content/travel/en/International-Parental-Child-

Abduction/abductions/hague-abduction-country-list.html (last visited April 11, 2022).  ICARA's

provisions "are in addition to and not in lieu of the provisions of the Convention." 22 U.S.C. §

9001(b)(2).

> It is the [Hague] Convention's core premise that "the interests of children ... in matters relating to their custody" are best served when custody decisions are made in the child's country of "habitual residence."  Convention Preamble, Treaty Doc., at 7; <u>see</u> <u>Abbott v. Abbott</u>, 560 U.S. 1, 20 (2010).
>
> To that end, the [Hague] Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides.  Art. 12, Treaty Doc., at 9 (cross-referencing Art. 3, <u>id.</u>, at 7).  The removal or retention is wrongful if done in violation of the custody laws of the child's habitual residence.  Art. 3, ibid.

<u>Monasky v. Taglieri</u>, —— U.S. ——, 140 S. Ct. 719, 723 (2020).  "The Convention's return

requirement is a 'provisional' remedy that fixes the forum for custody proceedings.  Upon the

child's return, the custody adjudication will proceed in that forum."  <u>Id.</u> (citing Linda Silberman,

*Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence*, 38 U.C.D.L.

Rev. 1049, 1054 (2005)).[1]

## II.    Procedural History

---

[1] During her closing argument, counsel for the Mother appeared to argue that this Court did not have jurisdiction to hear this case because the court in Mexico had jurisdiction over the parties' custody proceedings.  This argument confuses the Court's limited jurisdiction to determine whether the Children should be returned to Mexico under the Convention with the Mexican court's jurisdiction to adjudicate questions of custody under Mexican law.  Indeed, counsel's argument that the Mexican court has jurisdiction over the custody dispute actually strengthens the Father's argument that the children should be returned to that country.  Regardless, as the parties agreed in their proposed pretrial order, "[t]his Court has jurisdiction pursuant to 22 U.S.C. § 9003(a)."  (Doc. 62, p. 2.)

The Father initiated this case by filing his Petition with this Court on January 19, 2022. (Doc. 1.)  Therein, he alleged that, on February 13, 2021, the Mother—who is his ex-wife with whom he has two minor children (hereinafter, the "Children")—had taken possession of the Children under false pretenses and had absconded with them from Mexico (where the Mother, the Father and the Children had all been living) to the United States without the Father's consent.  (Id. at pp. 2–3.)  Following the filing of the Petition, this Court entered an Order requiring the Mother to remain in the Southern District of Georgia with the Children while the case is pending and to surrender to the U.S. Marshal all travel documents for herself and the Children.  (Doc. 8.)  The U.S. Marshal perfected service upon the Mother, who surrendered passports for herself and the Children.  (See doc. 12.)

After engaging in an abbreviated discovery period, the parties appeared before the Court for a two-day evidentiary hearing, without a jury.  Having considered the evidence admitted at the hearing, counsels' arguments, the parties' joint stipulations of fact, (doc. 51), the record, and the applicable law, the Court hereby issues its findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52.  To the extent that any finding of fact may be construed as a conclusion of law, the Court adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

## III.    Findings of Fact

### A.    The Parties' Marriage, Divorce, and the Mother's Removal of the Children

Both Mother and Father are citizens of Mexico.  (Doc. 51, pp. 1–2.)  Mother and Father married in 2010 and resided in Mexico.  (Id. at p. 2.)  While Mother and Father were married, the two Children were born (in 2012 and 2016, respectively).  (Id. at p. 1.)  Both children were born in Mexico and are citizens of Mexico.  (Id.)  According to her own testimony during the evidentiary

hearing, the Mother became pregnant with a child by another man, and the parties sought an uncontested divorce.

On November 6, 2020, the parties executed a settlement agreement regarding the parenting of the children in light of the anticipated divorce (the "Settlement Agreement").  (Id. at p. 2; doc. 65-3 (Jt. Exh. 2).)  As part of the Settlement Agreement, the Father has every weekend except the last weekend of each month for visitation with the minor children from 4:00 p.m. on Friday until 6:00 p.m. on Sunday.  (Doc. 51, p. 2; doc. 65-3 (Jt. Exh. 2).)  The Settlement Agreement also requires the parties to notify each other when either of them intends to travel with their minor children out of the State of Baja California, indicating the place where they will travel to and the date of their return.  (Doc. 51, p. 2; doc. 65-3 (Jt. Exh. 2).)  Another clause in the Settlement Agreement requires the Mother to inform the Father in advance when she has the need to change her domicile.  (Doc. 51, p. 2; doc. 65-3 (Jt. Exh. 2).)  On December 1, 2020, the parties were officially divorced—and the Settlement Agreement was ratified—by a court in Ensenada, Baja California, Mexico.  (Doc. 51, p. 2; see also doc. 65-9 (Jt. Exh. 8).)

While the Settlement Agreement provided that the Father would have the children on the first three weekends of each month, the parties concede that the Children spent additional time in their Father's care.  For instance, the Mother testified that the Children were exclusively in the Father's care from roughly December 25, 2020, through February 3, 2021,[2] during which time she and her new husband traveled to the United States and got married.

---

[2]  While the Mother testified clearly and unequivocally that she believed these were the approximate dates that the Children began and ended this extended stay with their Father, other evidence leads the Court to believe the time period may have been shorter.  (See doc. 65-13 (Jt. Exh. 12), pp. 34–46, 129–32 (electronic messages exchanged between the parties indicate that the Children were with the Mother on various dates during January 2021).)  During the evidentiary hearing, the Father testified that the Children were with him for 15 or 16 days while the Mother went to the United States to get married, but he did testify that they also stayed with him from January 29 to February 13, 2021 (prior to returning to the Mother and coming to the United States).  Fortunately, the specific length of time during which the Children were with the Father is

In February 2021, the Mother asked the Father if she could trade weekends with him, so that she could have the children with her for the weekend of her birthday—February 12–14—and in exchange he could have the children on the last weekend in the month of February. The Father agreed. On or about February 13, 2021, the Mother took the Children to the United States, and, since then, they have remained in Richmond Hill, Bryan County, Georgia, with the Mother, her current husband, and their infant daughter. (Doc. 51, pp. 1–2.) Prior to February 13, 2021, the Children had never lived outside of Mexico. While the Mother claims she had mentioned in the past that she was generally considering moving the Children to the United States, she admits that the Father had objected to the idea. She also admits that she never specifically advised the Father that she planned to move the Children to the United States on February 13, 2021, much less asked for his consent. The Father testified that he never agreed to the idea of the Children relocating to the United States. In March 2021, the Father filed a report regarding the Mother's taking of the children with the public prosecutor's office in Ensenada, Baja California. (See doc. 65-1 (Pet. Exh. 1).) In April 2021, he initiated proceedings pursuant to the Hague Convention with Mexican officials.

## B.    Evidence Relating to the Mother's "Grave Risk of Harm" Defense

The Mother claims that the Children will be in danger if they are returned to the Father in Mexico. According to the Mother's testimony and the testimony of other witnesses, Father and Mother's marriage was filled with acrimony and hostility. The Mother testified that, while she was pregnant with their first child, the Father threw some hot water (that she was preparing to use in the bathtub) at her face. She also testified that, at some undisclosed time, the Father grabbed

---

not material to any of the Court's decisions here. The material aspect of this information is that the evidence shows that the Mother, undisputedly, was willing and felt comfortable to leave the Children in the Father's exclusive care for weeks at a time right up to the time that she took the Children to the United States, which is relevant to her grave danger defense, discussed later in this Order.

her by the neck and threw her against a wall.  Finally, she testified—somewhat unclearly—that a few days after the second Child was born, she asked the Father to help with the baby, who was crying, and instead the Father "pushed the baby's head and hit [her] in the face with it."  The Father denied having ever been physically violent toward the Mother.

Other than the above-described unclear testimony regarding the incident that occurred a few days after the second Child was born, the Mother did not testify about any instances where the Father was violent with either of the Children.  When asked about violence in the presence of the Children, the Mother pointed only to an incident that occurred on August 31, 2020, prior to the parties' execution of the Settlement Agreement governing the custody and care of the Children.  A variety of evidence was presented about this incident, which the Court summarizes below.

According to the Mother's testimony at the evidentiary hearing, the Father had the Children in his care and told the Mother that he would not return the Children unless she surrendered their passports to him.  She went to his Mother's house, where he was staying with the Children and, when she arrived, one of the Children came out of the door and started screaming and asking her not to leave him.  She said the Father's brother (the Child's uncle) came up behind the Child, had him against a wall, and told him that he was not going to leave.  According to the Mother's own testimony, she asked the uncle to let the Child go and, when he did not do so, she hit the uncle in the face.  The uncle then began hitting her back.  The Mother's sister was also at the scene and when she got involved, she was struck as well.  It is unclear whether the Mother admits that she continued hitting anyone after hitting the uncle, but she says she told "them [that] they were hitting [her] sister," and she "tried to defend" her sister.  According to the Mother's hearing testimony, the Father also hit her during all of this.  She says she suffered scratches and bruises during the fight and her Child suffered an injury to his hand when the uncle held him against the wall.

6

According to the Father's testimony during the bench trial, he and the Mother were in a disagreement over the possession of the Children's passports, as he feared that the Mother would use the passports to take the Children out of Mexico.  He said the Mother arrived at his mother's house and started yelling.  He says the oldest Child came outside and was scared by the commotion, so the Father's brother began hugging him and telling him to calm down.  At this point, the Mother attacked the Father's brother, hitting him in the face on his body multiple times.  The Mother's sister then also began attacking the Father's brother, and she tried to attack the Father's mother. The Father denied any involvement in the physical violence and said that two of his sisters-in-law attempted to separate all of the individuals who were fighting.

During this family brawl, the Mother's sister called the police, but they did not arrive on the scene.  Instead, they came hours later to the Mother's apartment.  On September 1, 2020, the Mother filed a domestic violence complaint in which she detailed the August 31, 2020 family brawl and also described past instances of alleged abuse by the Father against her.  (See generally doc. 65-10 (Jt. Exh. 9).)  A domestic violence investigation was opened.  In the statement she gave to law enforcement the day after the brawl, the Mother, notably, claimed that the Father's brother attacked her (which is the opposite of her testimony during the evidentiary hearing, where she stated that she hit him first, in the face).  In the report, she described the Father's involvement in the family brawl only as "pulling [her] arms and [her] hair."  (Id. at p. 8.)  As for prior acts of violence and threats, she stated that on September 4 (presumably of 2019), prior to the parties' divorce, the Father had come to where she was staying and threatened to have her, "the [man] [she] was with[,] and the lawyer" killed.  (Id. at pp. 7–8.)  She said that, just after the Father made that statement, she went out to his car, at which time the Father grabbed her by the neck and pushed her.  (Id. at p. 8.)  She also said that the Father told her at this time that he has a cousin who had

offered to kill her for him.  (Id.)  In connection with the domestic violence investigation, the Mother's sister Liliana Buenrostro Diaz and her niece Marciela Buenrostro Mendoza were interviewed, but their statements only discuss the earlier acts of violence, which they apparently had not observed first-hand, as they said the Mother had told them about each incident.  (Id. at pp. 17–18, 20, 24.)

Although the domestic violence case has apparently remained open since the Mother's initiation of it in September 2020, it appears no action or progress was taken with regard to it for quite some time after the initial interviews were completed in the fall of 2020.  The Mother apparently did not push for a restraining order or any other protection or punishment against the Father.  Instead, as described above, roughly two months after the Mother filed the report, she and the Father executed the Settlement Agreement and apparently began cooperatively exercising their rights and responsibilities with regard to the children.  As referenced above, the Children were in the Father's exclusive care for more than a week (and, by the Mother's own testimony, more than a month) beginning on or around Christmas Day in 2020.  Shortly thereafter, the Mother removed the Children to the United States.

About two weeks after she was served with the Petition in this case, the Mother filed a supplemental report in the domestic violence case in Mexico, claiming that, "in recent days," the Father had sought out her sister (Liliana Buenrostro Diaz) and her niece (Maricela Buenrostro Gonzalez) and communicated to them threats of serious harm to the Mother if she returns to Mexico.  (See doc. 65-10 (Jt. Exh. 9), p. 37.)  The Mother requested the provision of protective measures in light of these threats. (Id. at pp. 37–38.)  The very next day, a "Measure of Protection" was issued prohibiting the Father from undertaking any intimidating or harmful conduct towards the Mother or persons related to her for 60 days.  (Id. at pp. 35–36.)

Marciela Buenrostro Gonzalez, the niece who has allegedly been on the receiving end of threats by the Father on the Mother's life, was not called to testify in this case, and thus did not corroborate or otherwise offer her own testimony about the alleged threats.  Liliana Buenrostro Diaz did testify during the evidentiary hearing, and she stated that the Father has told her that he has a family member who is a hit man who could kill the Mother, her new husband, and her attorney.[3]  She did not indicate when these statements had been made to her, much less that they had been made in recent months.  She also testified that, when they were married, both the Mother and the Father were always rude to each other and that the Father would do things to instigate the Mother, and in response the Mother would be rude and explosive.  She testified that, during the family brawl, both she and the Mother were hit by the Father and his family members.  She said, however, that she had never otherwise seen the Father hit the Mother, although she had, in the past, observed the Mother with bruises that the Mother told her were from physical abuse committed by the Father.

The Mother's step-niece, Jocelyn Martinez Machado, was also called to testify on behalf of the Mother.  According to her testimony, she lived with the Mother and the Father while she was in college, and she described them as being very rude to each other, and frequently yelling at one another.[4]  Noticeably absent from her testimony were any observations of the Father being abusive to the Mother or the Children.

---

[3]  It is not clear which attorney this was supposedly in reference to (i.e., one of the Mother's attorneys in this case or her attorney in Mexico).

[4]  The Court notes that, consistent with Ms. Martinez Machado's testimony, Joint Exhibit 1 and Joint Exhibit 12 contain electronic messages sent by the Mother to the Father that indicate that the Mother was not afraid to use hostile and berating language toward the Father.  (See doc. 65-2 (Jt. Exh. 1), pp. 25, 36–37; doc. 65-13 (Jt. Exh. 12), p. 127.)

During the evidentiary hearing, the Mother also called to the stand Josephine Coleman-Williams, who testified that she is a licensed clinical social worker and a military family and veterans certified social worker and a trauma specialist.  She was tendered by the Mother, without objection from the Father, as an expert in mental health, post-traumatic stress disorder, and the effects of domestic violence.  She testified that she had diagnosed the Children (who do not speak English and required a translator during her therapy sessions with them) with PTSD based on the facts that they sometimes got upset when they talked about the time period before they left Mexico, that they are clingy with each other and the Mother, that they sometimes have nightmares, and that they are nervous or fearful about things like going to school.[5]  On cross-examination, however, Ms. Coleman-Williams testified that she had only had three thirty-minute sessions with the boys, with the first session occurring on February 23, 2022, and the last session occurring just three days before the evidentiary hearing began on March 28, 2022.  Notably, when Ms. Coleman-Williams initially gave a summary of what the Children had told her about the family brawl, she said she was *not clear* about who attacked the Mother.  Later, however, she claimed that the Children had told her that the Mother was assaulted by the Father and other family members.  Absent from Ms. Coleman-Williams's testimony was any indication that the Children had told her that their Father had ever been abusive to them (or to their Mother at any time other than the family brawl), nor did she testify that she had a concern that the Father would pose a risk of direct harm to the Children.  When asked how the Children had described the Father, Ms. Coleman-Williams said the Children had told her about an instance where the Father was grouchy (when they woke him up while they were trying to surreptitiously take his cell phone) and another instance where he had sold the X-

---

[5]  The Court notes that Ms. Coleman-Williams testified that the Mother had told her that the Children had moved to the United States only a few months prior to the counseling sessions, when in fact it is undisputed that they had moved roughly one year before the counseling sessions began.

Box he had given them.  Many of Ms. Coleman-Williams' opinions and observations were based upon her personal beliefs and feelings about Mexico in general.  For instance, she extrapolated from her own research about the town where the Father lives and the descriptions of him that he is someone who feels the need to be "tough on the streets," though she did not explain what significance that has to the issues in this case.  The only *potentially* compelling testimony that Ms. Coleman-Williams offered was the general statement that a parent who makes threats of harm to the other parent could also choose to communicate those same threats (of harm to the other parent) directly to the children as a tool to make them behave.  The Court notes, however, that here there is no indication that the Father has ever communicated to the Children any sort of threat to harm their Mother.  Moreover, as noted above, Joint Exhibit 1 and Joint Exhibit 12 contain threatening electronic messages sent by the Mother to the Father.

During the evidentiary hearing, the Mother testified that she believes the Father will abuse her if she returns to Mexico because the Father is upset that she brought the Children to the United States.  Notably, however, when asked whether she has any fear that the Children might be victims of abuse if they return to Mexico, she offered only a rambling answer about being worried by a situation involving the Father's brother's new wife, who mistreats her own step-children.  The Mother made absolutely no reference to any concern that the Father posed a risk of harming the Children.

### C.     Parties' Credibility During Trial Testimony

A bench trial or evidentiary hearing affords a trial court an opportunity to observe the parties and their witnesses and to gain perspective and insight into each party's respective credibility, which a review of transcripts and documentary evidence does not typically afford.  See Bates v. U.S. Gen. Servs. Admin., 695 F. App'x 429, 433 (11th Cir. 2017) (noting after bench trial

that appellate court would "accord great deference to the trial court's credibility determinations, as 'the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses'") (quoting <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 749 (11th Cir. 2002)); Fed. R. Civ. P. 52 (when reviewing trial court's findings of fact following bench trial, "reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility").

After observing and hearing the testimony given by the Mother and the Father, and considering the lack of corroboration for certain allegations as well as the discrepancies between her own explanations as to how the family brawl occurred (specifically, whether she threw the first punch), the Court finds the Mother's testimony to be less credible than the Father's testimony, at least as to material issues of fact relating to the grave danger topic. The Mother's answers to questions were frequently long and rambling and non-responsive the questions posed to her, while the Father typically provided short and direct responses. The Court finds it compelling that, despite claiming that the Father physically abused her during the family brawl and even going so far as filing a complaint against him (though not against the other family members who she claims attacked her that day), the Mother did not pursue any sort of protective order against the Father and allowed the Children to stay with the Father for periods of time that greatly exceeded the three weekends per month that are allotted to him in the Settlement Agreement. Additionally, there is no evidence that she raised concerns about the Father's alleged violent tendencies in her divorce case. By her own admission, the Mother lied to the Father to get him to let her have the Children on a weekend when they would normally be with him, telling him she would let him have them on a later weekend, despite knowing that she was going to remove the Children from Mexico while they were in her custody.

The Court also finds it compelling that, almost as soon as she was served with the Petition in this case, the Mother filed a supplemental report claiming that she needed a protective order against the Father.  Notably, the threats she claimed that he had recently made to members of her family were almost the exact same threats she had claimed, in her original report, that he had made years prior.  However, after she previously reported these same threats, she continued to allow him to keep the Children for extended periods of time, and there is absolutely no evidence that the Children were ever threatened or harmed by him.  Tellingly, during the evidentiary hearing, she stated that if this Court finds that she must return the Children to Mexico, then she will pursue the domestic violence claim against the Father, which could enable her to modify the custody arrangement in her favor.  Moreover, though the Mother and the Children have been in the United States for months, the Mother only sought counseling services for the Children after being served with this Petition.  All of these factors lead the Court to suspect that the Mother's more recent accusations against the Father are driven by a desire to support the grave risk defense or to leverage some sort of concession or withdrawal by the Father in this litigation.

## CONCLUSIONS OF LAW

"The remedy of returning a wrongfully-removed child to their habitual residence is 'intended to restore the parties to the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings.'" Garcia v. Varona, 806 F. Supp. 2d 1299, 1308 (quoting Baran v. Beaty, 526 F.3d 1340, 1344 (11th Cir. 2008)). ICARA permits a person to file a petition for the return of a child in "any court which has jurisdiction of such action . . . in the place where the child is located at the time the petition is filed." Id. at 1309; see also 22 U.S.C. § 9003(b).  Likewise, ICARA permits United States courts to "take or cause to be taken measures under Federal or State law, as appropriate, to protect the

well-being of the child involved or to prevent the child's further removal or concealment before

the final disposition of [a] petition [for return under the Convention]." Stromme v. Stromme, 2017

WL 11219670, at *2 (S.D. Fla. Mar. 10, 2017) (quoting 22 U.S.C. § 9004(a)).  "The inquiry by a

Court in a return action under ICARA 'is limited to the merits of the abduction claim and not the

merits of the underlying custody battle.'"  Garcia, 806 F. Supp. 2d at 1309 (quoting Pielage v.

McConnell, 516 F.3d 1282, 1286 (11th Cir. 2008)).

A petitioning parent must prove "by a preponderance of the evidence, that her child was

wrongfully removed or retained within the meaning of the Convention." Berenguela-Alvarado v.

Castanos, 950 F.3d 1352, 1358 (11th Cir. 2020) (internal quotation marks and citation omitted).

A removal or retention is "wrongful" if:

> a) it is in breach of rights of custody attributed to a person, . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3.

Accordingly, here, the Father must prove three elements to establish a prima facie case of

wrongful removal: (1) that the Children were habitual residents of Mexico immediately before

their allegedly wrongful removal to and retention in the United States; (2) that the Children's

retention violates the Father's "custody rights" under Mexican law; and (3) that the Father was

exercising these "custody rights" at the time of the children's removal.  See Berenguela-Alvarado,

950 F.3d at 1358.

During the hearing, the Mother conceded that the Children were habitual residents of

Mexico at the time she removed them to the United States.  The Mother, however, denies that the

Father has (and thus also denies that he was exercising) "custody rights," as required to obtain relief pursuant to the Hague Convention.

## I.      The Father Has Established a Prima Facie Case of Wrongful Removal

It is undisputed that Mexico was the Children's country of habitual residence immediately before their removal and retention in the United States.  Accordingly, Mexican law—including, specifically, the law of the State of Baja California—governs the determination of whether the Father had "rights of custody" to the Children and whether the Mother's removal of the Children breached the Father's rights of custody.

The Convention "broadly" defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Abbott, 560 U.S. at 9 (quoting Convention, art. 5(a)) (internal quotation marks omitted).  Rights of custody arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."  Convention, art. 3.  "The intention of the Convention is to protect *all* the ways in which custody of children can be exercised, and the Convention favors a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration."  Hanley v. Roy, 485 F.3d 641, 645 (11th Cir. 2007) (quotations and citations omitted); see also Abbott, 560 U.S.  at 19.

Moreover, the Eleventh Circuit Court of Appeals has cautioned that:

[i]n American courts, we tend to think of custody rights primarily in the sense of physical custody of the child.  However, in applying the Hague Convention, we must look to the definition of "rights of custody" set forth in the Convention and not allow our somewhat different American concepts of custody to cloud our application of the Convention's terms.  Specifically, in this case we must think of "rights of custody" as including "rights relating to the care of the person of the child," and in particular, "the right to determine the child's place of residence."

Furnes v. Reeves, 362 F.3d 702, 711 (11th Cir. 2004), *abrogated on other grounds by*, Lozano v.

Montoya Alvarez, 572 U.S. 1, 134 S. Ct. 1224, 188 L. Ed. 2d 200 (2014).   Additionally, the

Eleventh Circuit explained that:

> [i]t is crucial to note that the violation of a *single* custody right suffices to make
> removal of a child wrongful. That is, a parent need not have "custody" of the child
> to be entitled to return of his child under the Convention; rather, he need only have
> one right of custody.  Further, he need not have a sole or even *primary* right of
> custody.

Furnes, 362 F.3d at 714–15.

During the hearing, the parties tendered, as a joint exhibit, a portion of the Civil Code for

the State of Baja California,[6] (Doc. 65-8 (Jt. Exh. 7)), which had been translated into English, as

well as testimony from competing expert witnesses in Mexican law.  The parties also both relied

upon their Settlement Agreement.  (Doc. 65-3 (Jt. Exh. 2).)

The evidence established that, pursuant to Mexican law, both the Mother and the Father

have "*patria potestad*" rights and responsibilities with regard to the Children.

> Mexican law labels the default bundle of rights that a parent may exercise over
> a child as *patria potestad*.  Generally, *patria potestad* is "understood to mean
> the relationships of rights and obligations that are held" by the father and mother
> of minor children.  Whallon v. Lynn, 230 F.3d 450, 457 (1st Cir. 2000).  *Patria
> potestad* constitutes the "'most comprehensive' right that a parent can exercise

_____

[6]  Bizarrely, the parties' jointly-tendered exhibits included not only the above-referenced six-page excerpt
from the Civil Code for the State of Baja California (which was their Joint Exhibit 7), (see doc. 65-8), but
also, without explanation, a 195-page comprehensive translation of the "Civil Code for the Free and
Sovereign State of Baja California Sur" (which was their Joint Exhibit 17), (see doc. 65-18).  The parties'
divorce was issued by a court in Ensenada, Baja California, (see doc. 65-17 (Jt. Exh. 16), p. 2), and the
Settlement Agreement pertaining to the custody and care of the children was "authorized and ratified" by
the State Center for Alternative Justice for the State of Baja California, (doc. 65-3 (Jt. Exh. 2)).  The Court
takes judicial notice of the fact that Baja California and Baja California Sur are distinct and separate (albeit
adjacent) Mexican states.   See "Baja California," Encyclopedia Britannica Online, available at
https://www.britannica.com/place/Baja-California-peninsula-Mexico (last visited April 5, 2022).   The
Court cannot conceive of any reason the civil code for the state of Baja California Sur would be relevant to
this case (indeed, it was never discussed by either party or their witnesses during the trial) and it thus
assumes that the submission of this 195-page wholly irrelevant document was the result of an oversight on
the part of the parties. Frankly, the Court is troubled by the fact that neither party—when reviewing the
exhibits they would be *jointly* asking the Court to consider—recognized that this document is not relevant
and its submission would cause the Court, at the very least, confusion.

over the person and property of his or her minor children."  Saldivar v. Rodela, 879 F. Supp. 2d 610, 624 (W.D. Tex. 2012) (citations omitted).

Fuentes-Rangel v. Woodman, No. 2:14-CV-00005-WCO, 2014 WL 11456066, at *7–8 (N.D. Ga. May 27, 2014), affirmed, 617 F. App'x 920 (11th Cir. 2015).  During the hearing, Mexican attorney Jesus Acosta Urias, appearing on behalf of the Father, testified that, regardless of which parent has physical custody of the Children (or which one has physical custody of the Children more frequently than the other), both parents have the same patria potestad rights regarding the Children.[7]  The Civil Code of Baja California indicates that patria potestad rights cannot simply and easily be waived by a parent, and they may only be terminated or deemed ceased in specific circumstances.  (See doc. 65-8 (Jt. Exh. 7), pp. 4–5.)  While a judge can—in certain circumstances listed in the Civil Code of Baja California—terminate a parent's patria potestad rights, there is no indication from the Settlement Agreement (or any other documents before the Court) or from any reliable testimony that the Father has lost his patria potestad rights.  Quite to the contrary, both Mexican attorneys (testifying on behalf of each party) testified that, even considering the terms of the Settlement Agreement, the Father continues to have patria potestad rights, including the right to make decisions regarding the care and upbringing of the Children.[8]  This testimony is consistent

---

[7]  While the Court found both attorney witnesses (Ms. Acosta, who was called by the Father, and Mr. Moreno, who was called by the Mother) to have generally been qualified and credible, the testimony provided by the Mother's witness (Mr. Moreno) seemed, in several instances (as described in the next footnote), self-contradictory.  At the very least, it was imprecise and thus confusing to the Court.  The testimony provided by the Father's witness (Ms. Acosta), on the other hand, was logical, reasonable, and thus more reliable and convincing to the Court.

[8]  While the Mother's attorney witness initially testified that the Mother has "full care and custody" of the Children while the Father only has "parenting time with them," he also conceded: that both parents have patria potestad rights; that, by moving the Children without notifying the Father, the Mother violated the Settlement Agreement and committed child abduction; and that the Father is entitled to make decisions regarding the care of the Children.  Additionally, the Mother's attorney witness testified that he represented both the Mother and the Father in their divorce, so the Court finds it compelling that he testified that, notwithstanding the arrangement established by the Settlement Agreement, the Father has retained his patria potestad rights.

with the relevant provisions of the Civil Code of Baja California.  (<u>See generally</u> <u>id.</u>)  Additionally, the Father's expert witness in Mexican law testified that, where both parents have *patria potestad* rights, if the parents cannot agree on where the child is to be domiciled, a judge is to make the decision; one parent cannot unilaterally decide, for instance, to move the child to another country.

"Courts across the United States have uniformly found that *patria potestad* is a right of custody under the Convention."  <u>Fuentes-Rangel</u>, 2014 WL 11456066, at *7–8, *aff'd*, 617 F. App'x 920 (citing <u>Saldivar</u>, 879 F. Supp. 2d at 624–25; <u>Whallon</u>, 230 F.3d at 458); <u>see also</u> <u>Seaman v. Peterson</u>, 762 F. Supp. 2d 1363, 1378–79 (M.D. Ga. 2011), *aff'd*, 766 F.3d 1252 (11th Cir. 2014) (discussing the doctrine of *patria potestas* in Mexico generally, and holding that, "here, *patria potestas* rights are rights of custody"); <u>Gatica v. Martinez</u>, No. 10-21750-CIV, 2010 WL 6744790, at *5 (S.D. Fla. Oct. 13, 2010), r*eport and recommendation adopted*, 2011 WL 2110291 (S.D. Fla. May 25, 2011) ("[W]hen faced with the question of whether '*patria potestas*' constitutes a 'right of custody,' most courts have concluded that the doctrine indeed confers such rights."); <u>Basil v. Ibis Aida de Teresa Sosa</u>, No. 8:07-CV-918-T-27TGW, 2007 WL 2264599, at *8 (M.D. Fla. Aug. 6, 2007) ("*Patria potestas* includes the parent's participation in the care of the child, which constitutes a custody right under the Convention.  Further, *patria potestas* affords participation in selecting the child's residence, which is another component of custody rights.") (quotations and citations omitted); <u>Lalo v. Malca</u>, 318 F. Supp. 2d 1152, 1154 (S.D. Fla. 2004).[9]  This Court reaches the same conclusion.

---

[9]  In her closing argument at the end of the evidentiary hearing, the Mother's attorney argued that, under the reasoning applied by the district court in <u>Lalo v. Malca</u>, where divorcing parents enter into a formal custody agreement, the agreement must explicitly state that a parent's *patria potestad* rights are being retained, or else the terms of the agreement control (and, in this case, the Mother claims that the agreement gives her full and exclusive custody rights and gives the Father nothing more than visitation rights).  The Court disagrees.  First, while the court in <u>Lalo</u> (which is not binding on this court) did find it compelling that the custody agreement before it explicitly stated that the father would continue to have "shared *patria potestas* power," the court did not specifically hold that such explicit language *must* be included in an

The Mother's proffered interpretation of the Settlement Agreement (as giving the Father insufficient rights of custody to satisfy the Hague Convention) conflates "rights of custody" as defined by the Convention with the physical custody of the child.  The Convention itself and myriad cases interpreting it make clear that the fact that one parent is given primary physical custody of a child in an agreement does not, on its own, mean that the other parent lacks any "right of custody" as defined by the Convention.  Accordingly, the fact that the Mother would "exercise the care of custody of the children" in her home the majority of the time (with the Father having "visitation and coexistence" with the children three weekend out of each month) does not mean she had exclusive rights and authority over the children.  (See doc. 65-3 (Jt. Exh. 2), p. 6.)   Indeed, nothing in the Settlement Agreement indicates that the Mother was to have the kind of exclusive rights and authority that she claims.

In light of all the foregoing, the Court finds that the Father has sufficient "rights of custody" as required by the Hague Convention.  The Court also finds that the Father was exercising his custody rights at the time the Mother removed the Children from Mexico in February 2020.  Courts "liberally find exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." Seaman, 762 F.Supp.2d at 1379. "Under this approach, a person [who] has valid custody rights to a child under the law of the country of the child's habitual residence . . . cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." Id.

---

agreement in order for a parent to continue to have such rights.  Additionally, even assuming the Mother's interpretation of Lalo were accurate, any attempt to apply such a holding in this case would fly in the face of the Civil Code of Baja California and the testimony offered by both expert witnesses that, in the absence of specific circumstances and/or affirmative actions and determinations, *patria potestad* rights are not simply or easily waived or terminated by a parent (such as by failing to explicitly state an intent to retain them).  Finally, as discussed in greater detail in this Order, the Mother's argument conflates "rights of custody" as defined by the Convention with mere physical custody of the child.

(quoting <u>Friedrich v. Friedrich</u>, 78 F.3d 1060, 1066 (6th Cir. 1996)). The Court finds that the Father was exercising his custody rights at the time of the removal, as the Children had regularly been spending weekends—and even full weeks or multi-week periods—with him. Consequently, the Mother's removal of the Children was "wrongful" pursuant to the Hague Convention. <u>Marquez v. Castillo</u>, 72 F. Supp. 3d 1280, 1287 (M.D. Fla. 2014).

## II.   The Mother Has Failed to Show, by Clear and Convincing Evidence, that the Children Face a Grave Risk of Danger if Returned to Mexico.

A respondent may assert as an affirmative defense that returning the child to the country of habitual residence would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation. Convention, art. 13(b); 22 U.S.C. § 9003(e)(2)(A). This exception, like the other exceptions under the Convention, is to be narrowly construed. <u>Gomez v. Fuenmayor</u>, 812 F.3d 1005, 1011 (11th Cir. 2016). Grave risk must be established by clear and convincing evidence. <u>Id.</u> at 1012; 22 U.S.C. § 9003(e)(2)(A). The party invoking the defense must demonstrate a risk that is more than "merely serious." DEPARTMENT OF STATE, HAGUE INTERNATIONAL CHILD ABDUCTION CONVENTION; TEXT AND LEGAL ANALYSIS, 51 Fed. Reg. 10494-01, 10510 (1986). This defense is not a consideration of the best interests of the child and return should not be denied on the basis that the country of removal provides better educational and financial opportunities or stability to the child than the return country. <u>Id.</u>

Here, the Mother claims that she has shown a grave risk of physical or psychological harm to the Children by showing that the Father has been violent with her in the past and has recently made threats of violence toward her. Domestic abuse or violence directed at a parent may constitute a grave risk, if it is shown, by clear and convincing evidence, that the return would place the children in danger of similar violence. See <u>Gomez</u>, 812 F.3d at 1013–14 ("Spousal violence,

in certain circumstances, can also establish a grave risk of harm to the child . . . when it occurs in the presence of the child.") (quoting <u>Ermini v. Vittori</u>, 758 F.3d 153, 164 (2d Cir. 2014)).

After considering the evidence described more fully in Background Section III.B, <u>supra</u>, the Court concludes that the Mother has failed to prove, by clear and convincing evidence, that the Children will face a grave risk of serious harm if returned to Mexico.  There is no evidence that the Children have ever been physically, verbally or mentally abused by the Father.  Indeed, based on her own testimony, the Mother decided to leave Mexico because her new husband (with whom she was expecting a child) got a job in the United States.  She did not testify that she left because she was afraid the Children had been or would be seriously harmed by continuing to live near the Father.  While the Court is certainly displeased by the fact that one or both of the Children had to witness the family brawl, the Court finds it compelling—for purposes of the narrow focus here on whether the Father poses a grave risk of serious harm—that the brawl occurred several months before the Mother left Mexico and that the Mother admits she initiated the brawl, by attacking the Father's brother.  The Court also finds it compelling that there was no testimony that the Father caused any specific, much less serious, injury to the Mother during the brawl.  While the Mother did testify to a few incidents where the Father had been abusive toward her, those occurred while the Children were very young and before the Mother and the Father divorced, and there is no evidence that any of the alleged instances resulted in injuries that required the Mother to seek medical treatment.

As to the more recent claims by the Mother, that the Father has begun making threats to harm her if she returns to Mexico, the Court does not find that the evidence presented on this topic is sufficiently clear and convincing to support a finding that the Father poses a grave risk of serious harm to the Children if they are returned to Mexico.  The Mother testified that the Father has, in

the past, told her that he has cousins who are contract killers and, if he told them to kill her, they would find her and do it.  The Mother's sister, Liliana Buenrostro, testified that the Father made essentially the same statement (about having family members who would be willing to kill the Mother) to her in the past.  However, neither the Mother nor her sister indicated even a general time period of when these statements were made to them.  While the Mother's supplemental report to law enforcement in Mexico states that the Father had communicated threats to her sister and her niece "in recent days," the Court is suspect of the supplemental report in general, as it was submitted by the Mother just after she was served with process in this proceeding, and her testimony in Court indicated an intent to use the domestic violence proceeding as some sort of leverage against the Father in the event he prevails in this case.

Furthermore, based on the way the threats are described, they sound incredibly similar to the threats the Mother described in greater detail in her initial report of domestic violence in September 2020 (when she indicated that the threats had been made in 2019).  Other than the Mother's statement in the supplemental report that the threats had been made "in recent days," no direct evidence was provided (for instance, by the two relatives to whom the threats were allegedly made) as to exactly how recently the threats were made.  (Indeed, it does not appear that the authorities in Mexico interviewed the sister or the niece to corroborate the Mother's report that the threats had been recently made.)  Additionally, the Court has reviewed many pages of electronic messages exchanged between the parties over the past eighteen months and the Court did not observe any messages sent by the Father that were even arguably threatening or abusive.  Finally, the Court notes that the Mother testified that she was willing and had offered to allow the Father to come visit with the Children in the United States, undercutting any claim that he poses a grave danger to them (or to her, for that matter). Thus, the Court finds considerable basis to doubt the

veracity of the Mother's claimed imminence of the threats.  Regardless, even assuming the Father did make the threats as alleged, the Mother has obtained a restraining order against him and criminal proceedings are apparently underway.  The Court has not been presented with any basis to find that the Father is unlikely to respect the provisions of that protective order.

Given the Father's denials and the questions the Court has regarding the Mother's credibility, the fact that no threats have ever allegedly been made with regard to the Children, the fact that the Children have never been harmed or threatened by the Father, and the fact that the Mother apparently had no concern about the safety of the Children when they were in the Father's care right up to the time that she removed them to the United States to live with her new husband, and that she has offered for the Father to have visitation with the Children if he comes to the United States), the Court finds that the Mother has not met her burden of showing by clear and convincing evidence that the Father will pose a grave risk of serious harm to the Children if the Children return to Mexico.  While this Court would never condone domestic violence, even if the Mother's accounts are true, courts facing similar allegations have found such allegations not to rise to the level of grave risk of danger to a child under the Convention.  See, e.g., Whallon, 230 F.3d at 459–60 (grave risk not established notwithstanding the alleged instances of verbal and physical abuse committed on the mother by the father as none of the abusive conduct was directed at the child and the evidence did not show a clear and long history of abuse); Foster v. Foster, 654 F. Supp. 2d 348, 361 (W.D. Pa. 2009) ("Petitioner's parenting skills and approach undeniably leave much to be desired.  However, I find that Respondent has failed to demonstrate by the clear and convincing standard that [the child] would be subjected to a grave risk of physical harm if he were returned to Canada.  The spankings, name-calling and physical discipline described by Respondent are more akin to . . . isolated and sporadic abuse . . . that, while regrettable, [is] insufficient to establish a

grave risk of harm to the child, than to . . . pervasive, severe, and dangerous behavior.") (quotations and citations omitted); Basil, 2007 WL 2264599, at *13 (grave risk defense not established where the respondent testified that the petitioner had a history of psychological abuse towards her with some degree of physical conduct, such as shaking her or throwing objects, but the spousal abuse did not occur in the children's presence and the respondent testified that she would have allowed the petitioner to have visitation with the children in the United States, which "militate[d] against the notion that the petitioner would endanger the children"); Ibarra v. Quintanilla Garcia, 476 F. Supp. 2d 630, 636 (S.D. Tex. 2007) (grave risk defense not established where "[d]efendant testified that plaintiff abused her physically and emotionally while in Mexico and failed to support her and the child, but there was no evidence that the plaintiff ever physically abused the child"); cf. Gomez, 812 F.3d at 1012 (grave risk established, despite lack of violence or threats to the child, based on finding that the removing parent faced a grave risk of harm if he were to return to that country due to his "ha[ving] encountered repeated threats on his life from [the left-behind parent and her husband], the shooting of his girlfriend minutes after he (and [the child]) had been in the car with her, vandalism of his mother's car, the presence of armed guards associated with [the left-behind parent and her husband] at court hearings, and repeated instances of drugs being planted in [the removing parent's] mother's car," particularly since the district court had found that it was "highly probable" that the left-behind parent and her husband were behind these various incidents).

  To the extent the Mother has suggested that the Children have been or will be psychologically harmed by being with the Father, the Court finds those claims and alleged fears to be undermined not only by the fact that, prior to moving, she allowed the Children to stay with him for extended periods of time and, since moving, she has invited him to come visit the Children, but also that she apparently never sought out counseling for or psychological evaluation of the

Children until after she was served with the Petition in this case.   Even the therapist who testified as an expert on the Mother's behalf conceded that the indicators of PTSD that she saw in the Children could have resulted, at least in part, from their being uprooted from Mexico and moved to another country.

Finally, as there was at least some testimony offered about Mexico generally being believed by some to be dangerous and/or the idea that the Children have better resources in the United States, this Court notes that courts in the Eleventh Circuit have repeatedly held that "general and unsupported assertions [that] a country is dangerous does not meet the standard for showing a grave risk of harm."  Da Silva v. Vieira, No. 6:20-cv-1301-Orl-37GJK, 2020 WL 5652710, at *7 n.12 (M.D. Fla. Sept. 23, 2020) (citing De La Riva v. Soto, 183 F. Supp. 3d. 1182, 1199 (M.D. Fla. 2016)); Crespo Rivero v. Carolina Godoy, No. 18-23087-CIV, 2018 WL 7577757, at *4 (S.D. Fla. Oct. 12, 2018) ("Venezuela's current political unrest" did not rise to the level of posing a grave risk of harm).

Accordingly, the Court finds that the Mother has failed to carry her burden of proving, by clear and convincing evidence, that the Children will face a grave risk of harm if they are returned to Mexico.[10]

## III.    Attorney's Fees and Costs

---

[10]  The Mother's Answer also raised the "well-settled" defense, claiming that the Children have been in Georgia for "approximately one year" and are doing well in school and have established social networks and relationships and thus should not be removed from the United States.  (Doc. 16, p. 2.)  The Mother did not appear to pursue this defense during the evidentiary hearing, however, and this defense appears to have been abandoned.  Nonetheless, even if the well-settled defense has not been abandoned, the parties' joint stipulations established that the Children were removed on or about February 13, 2021, (doc. 51, p.1), and, considering that the Father filed his Petition less than one year later (on January 19, 2022), (doc. 1), the well-settled defense does not apply.  See Fernandez v. Bailey, 909 F.3d 353, 359 (11th Cir. 2018) ("The Convention treats petitions filed in the first year differently from those filed more than one year after a child is removed: if the petition is filed within one year of the abduction, the signatory country where the child is located 'shall order the return of the child forthwith'; but when a parent petitions for return more than a year after a child has been removed, the signatory country 'shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.'") (quoting Convention, art. 12).

In his Petition, the Father requested that the Court award all legal fees, costs and expenses (Doc. 1, pp. 7–8.)   With respect to the award of attorney's fees and costs, ICARA provides, in pertinent part, as follows:

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3).   An award of fees and costs serves two purposes: (1) "to restore the applicant to the financial position he or she would have been in had there been no removal or retention" and (2) "to deter such removal or retention." DEPARTMENT OF STATE, HAGUE INTERNATIONAL CHILD ABDUCTION CONVENTION; TEXT AND LEGAL ANALYSIS, 51 Fed. Reg. 10494–01, 10511.   During the upcoming status conference, which is described in the Conclusion section below, the Court will discuss with the parties whether to schedule a hearing, or to instead simply accept briefing, on this issue of the amount of attorney's fees and costs to which the Father is entitled.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Petitioner Isai Ponce Munoz's Petition for Return of Child[ren] to Mexico and Issuance of Show Cause Order.   (Doc. 1.)   The Court **ORDERS** all parties and their counsel to attend a telephonic status conference on April 18, 2022, during which the Court will discuss and finalize with the parties and their counsel the logistics of returning the Children to Mexico safely and expeditiously.[11]   Counsel for the parties are **ORDERED** to confer with their clients and then to confer with each other prior to the status

---

[11] During the status conference, the Court will also determine when and how the Mother and the Children's passports will be returned to them.

26

conference to discuss (1) the preferred method(s) of being heard on the attorney's fees and costs award, and (2) working toward effectuating the return of the Children in a manner that best serves the Children's interests.  Finally, the parties are **REMINDED** that, since this matter has not yet reached final adjudication, the terms of the Court's Temporary Restraining Order, (doc. 8), remain in effect.

        **SO ORDERED**, this 12th day of April, 2022.

_____

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA